**BOARD OF APPRAISAL REVIEW FOR the TRAVIS COUNTY APPRAISAL DISTRICT, et al., Appellants,**

v.

**PROTESTANT EPISCOPAL CHURCH COUNCIL OF the DIOCESE OF TEXAS, Appellee.**

**No. 14066.**

Court of Appeals of Texas, Austin.

June 20, 1984.

Rehearing Denied Sept. 5, 1984.

Russell R. Graham, Calame, Linebarger & Grapham, Austin, for appellants.

John J. McKetta, III, Graves, Dougherty, Hearon & Moody, Austin, for appellee.

Before PHILLIPS, C.J., and POWERS and BRADY, JJ.

POWERS, Justice.

The Protestant Episcopal Church Council of the Diocese of Texas sued for judicial review of an order issued by the Board of Appraisal Review for the Travis County Appraisal District. The order denies the Diocese's application seeking exemption from ad valorem taxation with respect to 185 acres of land in Travis County. The district court, after a bench trial, granted the exemption, from which judgment the Board appeals. We will affirm the judgment below.

The 185 acres in controversy are part of a 392-acre tract of land owned by the Diocese and upon which is situated St. Stephen's Episcopal School, a school owned and operated by the Diocese. The 392 acres lie within a rapidly developing part of Travis County, the county served by the appraisal district. The Board granted exempt status for 207 acres of the larger tract but denied such status with respect to the remaining 185 acres in dispute. The buildings and other improvements associated with the operation of the school are situated upon the 207 acres granted exempt status; the remaining 185 acres are unimproved. It appears that the line of demarcation between the 185 acres and the 207 acres was drawn by the Board so as to encompass the improvements solely within the latter acreage. The dividing line drawn by the Board bears no relationship to any present or former ownership boundaries. During the trial de novo in district court, the Board stipulated that 4.35 acres of the 185 acres should be exempt as well, owing to their use as a roadway giving access to the area of the buildings and improvements. The district continued to insist, however, that the remainder of the 185 acres was not entitled to exempt status under the Constitution of the State of Texas, art. VIII, § 2 (Supp.1984), and Tex. Prop.Tax Code Ann. § 11.21 (1982).[1] The

---

1. The Property Tax Code became effective January 1, 1982. We shall summarize some of the provisions applicable to the present appeal.

Section 6.01 of the Code establishes in each county of the State an "appraisal district" charged to appraise property in the district for ad valorem tax purposes, for the benefit of the State and for each "taxing unit" authorized to impose the ad valorem tax. A board of five elected directors governs the appraisal district. § 6.03. The taxing units within the district finance its operations. § 6.06.

In addition to assigning values to the taxable property in the appraisal district, the district also administers the exempt-property provisions of the Code—§§ 11.01–11.28. To receive an exemption, the one claiming it must file with the district's chief appraiser an application for exemption. § 11.43(a). Ordinarily, an exemption is determined anew each year on an annual application; but in the case of certain classes of exemption this is not the case. § 11.43(b) & (c). For example, the exemption allowed for school property in § 11.21 continues, once it is awarded, until the property changes ownership or the qualification for exemption ends. § 11.43(c). In that connection, a duty is placed on the holder of the exemption to report promptly the termination of his entitlement, § 11.43(g); however, the chief appraiser may also initiate a termination of the tax-exempt status:

> If the chief appraiser learns of any reason indicating that an exemption previously allowed should be canceled, he shall investigate. If he determines that the property should not be exempt, he shall cancel the exemption and

deliver written notice of the cancellation within five days after the date he makes the cancellation.
§ 11.43(h).

The chief appraiser, an employee of the district, determines initially the applicant's right to the exemption for which he has applied. § 11.45. The chief examiner's determination is reviewable within the district by an "appraisal review board" instructed to determine, among other things, whether "an exemption ... is improperly granted" by the chief appraiser, and to instruct him accordingly. §§ 41.01, 41.02. A taxing unit or a taxpayer may contest, before the appraisal review board, the grant or denial of an exemption application. §§ 41.03(3), 41.41(4). The appraisal review board determines the contest after notice and an evidentiary hearing. §§ 41.05–41.08, 41.44–41.47; see also §§ 41.61–41.69.

The Code provides for judicial review of the order issued by the appraisal review board in resolution of the contest. Judicial review may be invoked by the chief appraiser, the taxing unit, or the property owner. §§ 42.01, 42.02, 42.031. The provisions governing judicial review are as follows:

> § 42.21. Petition for Review
> A party who appeals as provided by this chapter must file a petition for review with the district court within 45 days after the party received notice that a final order has been entered from which an appeal may be had; failure to timely file a petition bars any appeal under this section. Citation is issued and

trial court held to the contrary, from which holding the district appeals.

## THE PERTINENT CONSTITUTIONAL PROVISION

■ Article VIII, § 2 of the Constitution of the State of Texas provides as follows in subsection (a): The Legislature, by general laws, may "exempt from taxation ... all buildings used exclusively and owned by persons or associations of persons for school purposes and the necessary furniture of all schools...." Without this constitutional authorization for legislative action, no statutory authorization for exemption would be possible. Tex.Const.Ann. art. VIII, § 1 (Supp.1984); *Bullock v. National Bancshares Corp.*, 584 S.W.2d 268, 271–72 (Tex.1979). In *National Bancshares*, the Court delineated certain rules of construction applicable to the invocation of legislatively authorized exemptions from taxation:

> Statutory exemptions from taxation are subject to strict construction since they are the antithesis of equality and uniformity [as mandated by art. VIII, § 1 of the Texas Constitution] and because they place a greater burden on other taxpaying businesses and individuals. [citations omitted] An exemption cannot be raised by implication, but must affirmatively appear, and all doubts are resolved in favor of taxing authority and against the claimant. Simply stated, the burden of proof is on the claimant to clearly show that it comes within the statutory exemption.

served in the manner provided by law for civil suits generally.

§ 42.22. Venue
Venue is in the county in which the appraisal review board that issued the order appealed is located....

§ 42.23. Scope of Review
(a) Review is by trial de novo. The district court shall try all issues of fact and law raised by the pleadings in the manner applicable to civil suits generally.
(b) The court may not admit in evidence the fact of prior action by the appraisal review board ... except to the extent necessary to establish its jurisdiction.
(c) Any party is entitled to trial by jury on demand.

§ 42.24. Action by Court
In determining an appeal, the district court may:
(1) fix the appraised value of property in accordance with the requirements of law if the appraised value is at issue;
(2) enter the orders necessary to ensure equal treatment under the law for the appealing property owner if inequality in the appraisal of his property is at issue; or
(3) enter other orders necessary to preserve rights protected by and impose duties required by the law.

§ 42.25. Remedy for Excessive Appraisal
If the court determines that the appraised value of property according to the appraisal roll exceeds the appraised value required by law, the property owner is entitled to a reduction of the appraised value on the appraisal roll to the appraised value determined by the court.

§ 42.26. Remedy for Unequal Appraisal
The district court may not grant relief on the ground that a property is appraised unequally in comparison to the level of appraisals of other property in the appraisal district unless the appraised value of the property varies at least 10 percent from its value calculated on the basis of the weighted average level of appraisals in the district. In that event, the court shall order the appraised value changed to the value as calculated on the basis of the weighted average level of appraisals in the district.

§ 42.27. Additional Remedy for Erroneous Value
(a) The issue to be determined by the district court in an appeal under this section is whether or not the market value of the property in question according to the appraisal roll is in error.
(b) If the trier of fact finds that the market value is in error, meaning it is higher than the value set out by the property owner in a property information report properly filed pursuant to Chapter 22 of this code, then the trier of fact shall fix a market value for the property in question as of January 1 of the tax year of controversy. In order for a taxpayer to prevail on appeal, the variance in market value must be found to be in excess of 5 percent of the market value as contended by the taxpayer.
(c) The market value fixed by the court or jury pursuant to Subsection (b) of this section shall be binding on the taxing units or unit involved in the law suit for the tax year in question.
(d) A taxpayer who prevails in an appeal to the court shall be entitled to reimbursement for reasonable attorney's fees.

The foregoing provisions are set out as they existed at the times material to the present appeal. Some have since been amended.

584 S.W.2d at 271–72. The limits of legislative authority authorized by art. VIII, § 2 are these: the Legislature may authorize exemption only for "buildings" used "exclusively" for school purposes when the "buildings" are "owned by persons or associations for school purposes." We are not presently concerned with the "furniture" aspect of the constitutional provision.

Before turning to the statutory exemption pertinent to the present case, we should observe that the Supreme Court of Texas has had occasion to assign meaning to the constitutional provision with which we deal, as measured against earlier statutory exemptions. In *Cassiano v. Ursuline Academy*, 64 Tex. 673 (1885), the Court held that the word "building" of necessity included the land upon which a building rested. This holding is not remarkable, of course. Still within the concept of "necessity," however, the Court expanded the constitutional word "building" to include "all the land ... necessary and used for the proper and economical conduct of the school." 64 Tex. at 676. The Court added:

> Every person who occupied any portion of the premises was exclusively engaged in some department in the service of the school. The grounds were used for the recreation of the pupils, and to supply the school table with vegetables. Authority is not wanting to extend the exemption to land much less directly employed to forward the interests of the school.

*Id.* The Court justified its expansion of the meaning of the word "building" by citation to the public service performed by private education and the absence of any evidence that the framers of the Constitution intended to discourage such endeavors by "a spiteful discrimination against private schools." *Id.* at 675. Evidently, the students of the school boarded there, as did the nun teachers who "lived upon the premises as a family...." *Id.* at 673–74.

In *St. Edwards' College v. Morris*, 82 Tex. 1, 17 S.W. 512 (1891), the Court dealt with the following factual circumstances:

> The buildings used for said school ... were situated on the 499 acres of land ... belonging to plaintiff. These buildings included recitation rooms, dormitories, gymnasium, and outhouses, which, with the play-grounds, included about five acres of land. Of the balance of said 499 acres, about 160 acres was [sic] in a state of cultivation, (that is, was a farm,) but only about two-thirds of it was cultivated in 1889. On this farm was an orchard and garden. The remainder of the land was a pasture. The school was and is a boarding school....

17 S.W. at 512. The produce and stock on the farm "were used to supply tables for the boarding school" and none were sold. *Id.* Focusing primarily on a different element derived from the constitutional provision, that is, the concept of "exclusively ... for school purposes," rather than upon the idea of necessity, the Court held that the five acres only were exempt from taxation and the "farm" was not. The Court stated:

> It may have been convenient to have lands, in connection with those used for school purposes, that might be used for agricultural or pasture purposes, and thus supply much that went to furnish the table of a boarding school; but we are of opinion that the lands so used by appellant were not used exclusively for school purposes.

*Id.* 17 S.W. at 513. The rationale of the holding apparently was this: the exemption for private schools under the constitutional provision is coextensive with the public service performed by them in educating students who otherwise would be educated at public expense; the exemption allowed *public* schools by the terms of a corollary statute can extend in the ordinary case only to such lands as bear a *direct* relationship to "public instruction," although it is possible for such instruction to require lands to effectuate the instruction as a practical matter, as in agricultural and mechanical education, "or other pursuit," a situation not then before the Court; therefore, to allow exemption for the farmland of St. Edwards, when this exemption would not be available to a public school, would

be to extend the exemption *beyond* the public service which constitutes the *quid pro quo* of the exemption. *Id.* The Court then rejected St. Edwards' claim to the exemption, which claim the Court characterized as follows:

> It is now claimed, however, that under the word "buildings" should be embraced all lands which may be used by the owner in a manner which contributes to enable him to conveniently and cheaply supply the table for a boarding-house, kept for pupils, when the land thus used is contiguous or immediately connected with the land used exclusively for school purposes.

■ Comparison of the holdings in *Ursuline Academy* and *St. Edwards'* is difficult owing to the sparse facts given in the former opinion. The two opinions do suggest that the issue of *reasonable necessity* is the touchstone for decision when exempt status is claimed for lands used *exclusively for school purposes that are non-instructional in nature;* and that the question is one of fact in each dispute. *Ursuline Academy* was tried on a statement of agreed facts; *St. Edwards'* was reviewed by the Court on a basis of the trial court's findings of fact. The trial court judgment was affirmed in each case. *Cf., Davies v. Meyer,* 541 S.W.2d 827 (Tex.1976) ("What constitutes an actual *place* of religious worship as those words are used in the Constitution and statutes is a fact issue which the claimant has the burden to prove.") 541 S.W.2d at 829. (emphasis added).

### THE PERTINENT STATUTORY PROVISION

The statute applicable to the present case echoes what we discern to be the common thread in *Ursuline Academy* and *St. Edwards'.* Section 11.21 of the Property Tax Code provides:

> (a) A person is entitled to an exemption from taxation of the buildings and tangible personal property that he owns and that are used for a school ... if:
>
> > (1) the school is operated exclusively by the person owning the property;
> >
> > (2) ... the buildings and tangible personal property are *used exclusively for education functions;* and
> >
> > (3) the buildings and tangible personal property are *reasonably necessary for the operation of the school.*
>
>      \*     \*     \*     \*     \*     \*
>
> (e) In this section, "building" includes the land that is *reasonably necessary* for use of, access to, and ornamentation of the building.

(emphasis added). The trial court found, in the present case, that the buildings and the entire 392 acres are "reasonably necessary for the operation of St. Stephen's Episcopal School," for access to the school, and for its ornamentation and use. The Board attacks these findings of fact as being against the great weight and preponderance of the evidence.

### DISCUSSION AND HOLDINGS

The Board's contention takes the form of an argument that the uses made by the school of the 185 acres are *unnecessary* to its educational functions and purposes in any real or objective sense, and are made "necessary" in that regard only in reference to the peculiar tenets of the educational philosophy held by the school proprietor.[2] While admitting that the 185 acres

---

2. In its brief, the Diocese points out the public expense saved by its educational efforts conducted at private expense. It then develops from the evidence adduced at trial how and why the 185 acres are reasonably necessary for the operation of the school. We shall summarize these matters.

The school is a boarding school where faculty and students live on the premises. The 392 acres, of which the 185 acres form a part, were originally in a rural setting but have recently been enveloped by commercial and residential developments on the surrounding lands. The 392 acres were originally selected for the school because they were, being in a rural setting, suitable for the kind of school the Diocese intended to establish and operate.

The Diocese designed the school to provide a higher-than-average secondary education in the environment of a "discrete Christian community" where students would participate in democratic processes and encounter the challenge of

are "necessary" under the philosophy held by the Diocese, as shown by the evidence, the Board argues that the resulting expansion of the concept of necessity goes beyond what is permissible under art. VIII, § 2 of the Constitution and § 11.21 of the Code which imply a more direct and limited meaning of the word "necessary," as indicated by the decision in *St. Edwards'* where the Court affirmed the holding that the farm, although "convenient" for operation of the college, was not a use of the land exclusively for "school purposes" because it was too indirectly related to formal instruction. Moreover, the Board suggests with some logical force that if a school proprietor is able to avoid taxation of a portion of its property merely by adopting an educational philosophy that makes the portion "reasonably necessary" for the operation of the school, he is sure to do so and the restrictive sense implicit in the word "necessary" becomes meaningless. The proprietor is thus able to determine, unilaterally and merely by the beliefs he holds subjectively, his entitlement to an exemption under § 11.21.

We believe, however, that the concept of reasonable necessity will allow the trial court's conclusion that the uses made of the 185 acres, as shown by the evidence, are reasonably necessary for operation of the school and that such uses are exclusively for school purposes. The uses are not merely convenient under the evidence; rather, they form an integral part of the students' "education" considered both in a narrow and in an enlarged sense. We note in the first instance that the 185 acres are used directly as a part of *formal* instruction in art, biology, geology, and archaeology; and for recreational and athletic purposes as specified in footnote 2. These uses come literally within the holding of *St. Edwards'* as justifying the exemption. There is no suggestion that these uses are *de minimus*. The trial court's findings may be affirmed on this basis alone.

In addition, however, we conclude that the trial court was entitled to weigh the facts relating to how and why the 185 acres were necessary to the school's educational endeavors beyond their use for formal instruction, recreation, and athletics. We note, for example, that the goals of *public* education in our State are not limited merely to formal instruction in traditional classroom subjects, coupled with physical education, athletics, and recreation. Rather, the goals include such things as these:

1. Assuring "behavior patterns which will make each" student "a responsible member of society."

self-government in living together, as well as the "burden of authority." The school has been conducted accordingly. Under the view of the Diocese's witnesses, the students are pushed to excel in academic, recreational, athletic, and perhaps other pursuits. The somewhat self-contained aspect of the boarding school, coupled with the proclaimed goal of pushing its students to their intellectual, physical, and psychological limits, is said to render necessary the 185 acres for several practical reasons.

They are required as a "buffer" against the residential and commercial development of the surrounding lands. Without the separation provided by the 185 acres, the "discrete Christian community" would melt away, to be absorbed into the larger surrounding community, defeating the above-mentioned goals of learning self-government and democratic processes, through actual practice of the arts, in a Christian community. Moreover, the "buffer" of the 185 acres permits the school more effectively to perform the duties imposed upon it by the doctrine *in loco parentis;* the school is able to maintain discipline and control of the students only because they may, with safety, be allowed general and specific use of the 185 acres in lieu of leaving school property for other activities.

The evidence shows that students utilize the 185 acres for certain purposes constituting a part of formal instruction in biology, art, geology, and archaeology. Other evidence shows that students use the 185 acres for athletics and recreation: hiking, cross-country running, jogging, and horseback riding from stables on the exempt portion of the school property.

Approaching the concept of "necessity" from a negative point of view, the Diocese introduced evidence that it refused to consider reducing the size of its property even when it could have sold a portion to offset its financial deficits; that it made contingent arrangements to maintain the size of its property when a portion was to be taken by eminent domain; and that it was holding the 185 acres not for speculation but for the school's overall educational purposes and functions.

2. Helping students achieve "[c]ompetence in judging the merits of comparative political systems and ideologies with emphasis on democratic institutions" and "[s]kills for participating in the process of ... private political organizations...."

3. Inculcating "[s]kill in sports and other forms of recreation which will permit lifelong enjoyment of physical exercise," as well as "[k]nowledge and experiences to provide information and develop skills and values needed to perform daily activities...."

4. Achieving "[k]nowledge about basic psychological, sociological, and cultural factors affecting human behavior;" "[s]kills in interpersonal and group relations, and information of ethical and moral standards of behavior," as well as "[s]kills for coping with stress and pressure."

5. Imparting "[c]ompetence and skill in creative and responsible use of leisure time."

Texas Education Agency, Goals for Public School Education in Texas (rev.ed.1979). (The goals are promulgated by the State Board of Education, "the policy-forming and planning body for the public school system of the state." Tex.Educ. Code Ann. § 11.24 (Supp.1984).) The goals of public education are not unlike the goals of the Diocese as shown in the evidence. If such goals form part of "public instruction," in the words of *St. Edwards'*, and they do, the similar goals of the Diocese are legally permitted to form part of the operation of St. Stephens and its educational functions, under the holding in *St. Edwards'*. In other words, one may not say as a matter of law that the benefits and usefulness attributed by the Diocese to the 185 acres do "not more or less directly tend" to further the end of the educational functions of St. Stephens; or that they exceed what is necessary for public education and, by analogy, for private education. *St. Edwards' College v. Morris, supra* 17 S.W. at 512. If public education is permitted this enlarged sense of "education," no reason appears for denying it as a legitimate end of private education. We hold, according-

ly, that the trial court did not err in weighing as part of the evidence the necessity assigned by the Diocese to the 185 acres in light of the peculiar style of education it conducted on the entire tract of 392 acres. We need not consider, in the present case, the problem suggested by the Board relative to less-than-*bona fide* claims to the exemption allowed by § 11.21 of the Property Tax Code.

■ While our holding is a sufficient disposition of each of the three contentions of the Board relative to the findings of fact made by the trial court, we should address briefly an additional point of error raised by the Board on appeal. It contends that the trial court erred

in the absence of any showing of fraud or mistake of law or fact or arbitrary acts on the part of the administrative body responsible for the decision challenged by appellee, in substituting its judgment for that of the administrative body.

In the Board's argument, it asserts that

where the administrative body has performed its responsibilities in a proper manner their decision must be given some credence and weight and cannot be set aside simply because reasonable minds might differ with their decision.

In substance, the Board argues for a substantial-evidence scope of review of the Board's decision denying an application for exemption. We find, however, that § 42.23 of the Property Tax Code quite specifically provides for trial *de novo* review of such decisions "in the manner applicable to civil suits generally" and the Board's decision is not even admissible on judicial review except to establish the court's jurisdiction. We overrule the Board's point of error.

■ The Diocese, by cross point, contends the trial court erred in denying its claim for attorney's fees, a claim based upon the provisions of § 42.27(d) of the Property Tax Code. We reject the Diocese's invitation to construe the provision beyond its context, wherein such costs may be awarded as "an additional remedy" re-

coverable on a successful judicial review of the Board's decision assigning an erroneous value to the taxpayer's property. That is not involved in the present case. The statute is penal in character and must be strictly construed. *Van Zandt v. Fort Worth Press,* 359 S.W.2d 893 (Tex.1962).

Finding no error as assigned, we affirm the judgment of the district court.